and we have Scott Hendricks for the appellant and Michael Maurizio for the appellant. Please accord with Maurizio. My name is Scott Hendricks and I represent the Carbondale Police Pension Board. I'm asking this court to reverse a ruling by the circuit court in Jackson County, Illinois and affirm the decision of the Carbondale Police Pension Board with respect to the disability application of the plaintiff Jeffrey Vaughn. In my brief I present this appeal as three issues and actually two of them I think are intertwined. The first issue that I raised with the circuit court erred in reversing the pension board's finding that the plaintiff was not disabled. The second issue that I raised with the circuit court erred in reversing the pension board's finding that the plaintiff was not injured to the extent it's claimed and I believe that those first two issues are issues with respect to the findings of the pension board are against the manifest weight of the evidence and it's our position is that the circuit court improperly applied the standard as the that the findings of the pension board is not against the manifest weight of the evidence which has been defined as in determining whether a ruling or findings against manifest weight of the evidence that the opposite inclusion is clearly evident also that if the record contains any evidence to support the findings in this case of the pension board their findings should have been upheld and we believe the circuit court improperly applied that standard in reversing the pension board's findings. The third issue that we raised was that we assert that or I assert that the circuit court erred in reversing the pension board's ruling that the plaintiff was not injured performing an act of duty as defined by the pension code and for and because of the reverse circuit court ruling in this case. The third issue that I raised I believe is a mixed question of fact and law which which a different standard of review is imposed and that is that it should that the findings of the pension board should have only been reversed if the decision or the finding was clearly erroneous and that has been defined as when the court is left with a definite and firm conviction that a mistake has been made. Again I believe the circuit court did not properly apply that standard in reviewing the decision of the pension board and we're asking this court to reverse that circuit court's decision with that regard. The facts in this case are that on April 11th of the year 2007 the plaintiff Jeffrey Vaughn filed an application with the Carbondale Police Pension Board for a pension disability and specifically an on-duty pension disability and that application was made almost two years after the incident that the plaintiff was claiming caused his disability. That incident was reported to have occurred I believe on June 27th of the year 2005. On his application which is exhibit one in the exhibit list in the record he stated that he had hit his head on his squad car door while he was reaching into the car. The evidence or the evidence that was presented to the board also indicated that he had reported this incident at the end of his shift on that day and the report taken by the the reporting officer at that time, Lieutenant Eccles, indicated that the that Mr. Vaughn had stated that he had felt a pull and pain in his back while reaching into his vehicle and had made no reference to hitting his head. Attached to Mr. Vaughn's application were certifications of three doctors that Dr. Vaughn or excuse me that Mr. Vaughn had gone to see. Can I ask you about Mr. Eccles report? Yes. Was that something that generally was written up and then the the officer who allegedly was injured would sign? I don't believe so your honor. I think the report was just reported to the officer and they write that down and that's just made part of the file. I believe Mr. Vaughn's testimony in all honesty was that he's not seen that report I believe he said but he also testified that he didn't recall what he told Lieutenant Eccles at the time. Again attached to that application were certifications of three doctors that he had seen. Well under the pension code when an officer applies for a disability pension the pension code requires the board to select three doctors to examine the applicant to determine the disability pension and actually the pension statute provides in 40 ILCS 5-3-115 that a disability pension should not be paid unless there is filed with the board certificates of the police officer's disability subscribed and sworn by the police officer and three practicing positions selected by the board. It also states the board may require other evidence of disability. In this case Mr. Vaughn attached some certifications from three doctors those are the exhibits 6, 8, and 9 in the record those being the records of Dr. Blais, Dr. Goscio, and Dr. Woods. In their decision the pension board reviewed those records as well as records of the three doctors that they selected to examine Mr. Vaughn. So it was six doctors? You said also with the three that they selected? So there's six doctors? There's actually eight doctors. Oh eight doctors. The board selected and Mr. Vaughn apparently selected you know there's no evidence of this but selected those doctors himself not in accordance with the pension code. The pension code says the board is supposed to identify three doctors and then Vaughn is examined by them. They selected Dr. Cantrell, Dr. Tate, and Dr. Southar and their records are located in the exhibit list as well. Dr. Cantrell's are exhibits 16 and 17, Dr. Tate's are 13 exhibits 13 and 14, and Dr. Southar is exhibit 18. The pension board reviewed all the doctor's reports. They also received other medical records from other visits to a couple other doctors. So there was quite a medical records in the record. Actually it's a rather thick set of records that were presented to the board. Actually there were 21 exhibits. In addition to the medical records the board was presented with records from the city of Carbondale and those records reflected that Mr. Vaughn had made an application for workers compensation benefit and went through that process and sometime in late 05 or early 06 he was examined again and on May 31st 2006 a year later he was ordered to return to work by the city of Carbondale on the basis that he had reportedly recovered from whatever he had. Mr. Vaughn did not report to work and as the evidence indicated in the record he was sent another letter in November of 2006 again advising him that if he did not return to December 2nd 2006 he was officially terminated by the city of Carbondale for not returning to work. That was some of the additional evidence in the records. One of the doctors selected by well on February 5th 2009 after the doctors that were selected by the board examined Mr. Vaughn and his medical records there was a hearing held on February 5th of 2009 and based on that hearing the pension board consisting of four members at that time made a ruling and found that Mr. Vaughn number one was not disabled to the extent that rendered him it necessary to terminate him from his job as a police officer and two they also made the finding they didn't believe that he was injured to the extent that he claimed or that he was injured as a result of an act of duty pursuant to the statute. That board ruling was issued on March 24th and that was appealed to a certain court. Judge Grace reviewed that decision and overturned it reversed that decision and we believe incorrectly imposed his own decision making process on these records and did not apply the standard of review of the pension court's board's decision. Um so my position the board's decision is not against the manifest weight of the evidence court will review the board's decision they did recite what they based their decision on principally one of the principal things they relied on was Dr. Cantrell's report. Dr. Cantrell if you review if the records are reviewed not only the doctors that Mr. Vaughn selected but the other doctors Dr. Cantrell did the most thorough examination he actually examined him on two capacity evaluation performed and he also had an MRI uh taken of Mr. Vaughn in his evaluation and based on that evidence he decided or his opinion was that Mr. Vaughn was able to go back to work he just needed work hardening and that's what the pension board held as well. That finding was also supported by some of the other doctors opinions in fact the doctors that that Mr. Vaughn selected uh for example exhibit six Dr. Blaze's certificate which was rendered on November 10th 2006 if you look at his examination that day he didn't examine uh Mr. Vaughn to make that decision in 2006 he just interviewed Mr. Vaughn uh they did take his blood pressure and his heart rate and those kind of things but if if you review exhibit six you'll note that it just said based on patient statement uh and and he was reporting to his doctor that he didn't think he could return back to work. Did all the doctors or can you tell me the breakdown of the doctors that thought he could return to full duty? Well his three doctors certified that they thought he could not but again if you look at those records their records were all dated prior to his application uh or their review was all prior to his application for disability and it was based on their prior exams with him in 2005 and 2006 in fact Mr. Vaughn testified that he didn't do anything after 2006 especially with regard to work hardening and that was another factor that the pension board decided uh that you know if he went and did the work hardening as described by called physical therapy or just you know working out and getting back into shape he could have returned to work uh so. Did any of the pension board's doctors say he could return to a full duty? Yes. Without restrictions? I'm sorry Dr. Cantrell uh expressed that opinion, Dr. Suthar expressed that opinion, Dr. Tate expressed the opposite opinion and said she did not believe he could return to work. I'm talking about without restrictions. I believe Dr. Cantrell's opinion and Dr. Suthar's opinion was that he could return to work without restrictions if he would go through a work hardening program to get back into shape to be the police officer he was. I mean he had you know off duty since uh 2005 and and we're we were in 2009 so I mean he hadn't done and his testimony was since I'm sorry I got something he testified that he hadn't done any kind of work hardening or any effort since 2006 so uh the basis of the pension boards the primary basis was Dr. Cantrell's report based on his examination. Now Dr. Cantrell also compared the MRI taking of the applicant Mr. Vaughn back in 2005 to the one that he took or had Mr. Vaughn take in 2008 and noted that it appeared that all the if you want to call them compression fractures that may have appeared on the first MRI were no longer there that they had resolved themselves and they couldn't find any reason for him to not be able to return back to work other than work hardening I think that's you know synopsis or a nutshell of Dr. Cantrell's report. I would note that there were two other sets of medical records that were in there Dr. Southar's and Dr. Reincell's both indicated and they were doctors that reviewed Mr. Vaughn for the workers comp claim that he fought against the city of Carbondale. I believe they were positions selected by the city of Carbondale but they both also find that he could return to work and with work hardening and those I believe you'll find it as part of exhibit 19 excuse me part of exhibit 12 which are the medical records of of Dr. I think Dr. Gosheel. Again looking at the three certificates of the doctors that that Mr. Vaughn did present besides Mr. Blaise was Dr. Gosheel's and again there was no new examination he was relying on his observed observations of Mr. Vaughn earlier. Dr. Woods saw Mr. Vaughn on April 9th of 2007 but in his notes state that he saw him at the request of Dr. Blaise and basically did an interview and some and some review of that and gave the opinion that he thought that he was not able to return to work. But again these were none of the doctors that were selected by the board as required by the pension code and that the board looked at. Again we believe that the court's decision to reverse the finding of fact that they made by the pension board that Mr. Vaughn was not disabled to the extent necessary to for him to be retired as a police officer were based on again Dr. Cantrell's report. I think it's supported by a couple of the other doctors Sue Thar, Dr. Reisnell those again are found in Exhibit 11, Exhibit 12. The city of Carbondale demanding he returned to work as a police officer was another factor that they considered and the city of Carbondale gave him at least three opportunities to report back to work but he made no effort to not and he made no effort to go to work Carbondale to put himself in a physical position to go back to work and also assert to this court that had he done the work hard it might have shown that he couldn't return to work but we don't know because he didn't do it. So we had to base you know they based their decision on the investigations performed by the three positions that they selected. So again my position that the record contains substantial evidence to support the finding the fact that he was not disabled to an extent to retire him as a police officer and I'm asking this court to reverse the circuit court's order in reversing the pension board's decision in that matter. Now the other item was that the pension board also stated that Mr. Vaughn did not suffer an injury while performing an act of duty right and and Mr. Vaughn's statement was that he hit his head on the door frame while reaching in the car to answer his radio and there's been as you can note in the briefs there's been several variations of that statement after you know he got on to hitting the head which was a little different than we believe in the initial report. There's a definition of active duty in the code it's in 40 ILCS 5-5-113 defines an act of duty is any act of police duty inherently involving a special risk not ordinarily assumed by a citizen in the ordinary walks of life imposed on a policeman by the statutes of this state or by the ordinances or police regulations of the city uh in which this article is in effect or by a special assignment. Now there's another sentence that talks about acts of heroism but I don't think that applies in this case. The board sat there heard the testimony review the reports and said reaching into the police car was not an act of duty. He was reaching in for a radio for the radio he was reaching in for a radio. Right um if you or I tried to do that with a policeman standing there reaching into his car to get the radio you or I would be arrested. Why why is this not an act of duty? Well I don't necessarily agree what because I don't think it because the definition of active duty and I agree the Supreme Court and the Johnson uh versus Retirement Board of the Policeman's Annuity and Benefit Fund has given us somewhat of a definition of that but the statute actually says any act of police duty inherently involving special risk. I don't think there's any special risk in reaching into a car to pick up a radio. So it's there's no question that he was on duty and he was acting as a police officer. You're saying that criteria has to be something um that involves an additional risk and you're saying it has to be something inherent. Inherently involving a special risk common not ordinarily assumed by a citizen in the ordinary walks of life. And and I find that a little bit confusing because I would say that would apply to police work in general but you're saying that there's the statute has a special subset of police type of work. I believe that's true and and you know I mean one of the distinctions even I believe in the Johnson case point out is if you're doing desk work there's nothing especially in there inherently risky with that. It might be in my office but not generally. So there you know there are some distinctions have been made by some of the some other courts and looking at whether something is inherently involving special risk. Supreme Court in Johnson I believe that was a 5-4 decision and just just as I think Justice Reiner wrote the opinion didn't give us really I don't believe gave us a true definition and did not in fact or did not even recite to 5-5-113 in his opinion. The dissenting opinion said in in that particular case that the act of walking across the street is not an act of duty. In that case the police officer is walking across the street to engage with a citizen and the Supreme Court said that that was when he slipped and fell in a puddle of water that that wasn't an injury there was more light on this issue looked at the statute and said there's nothing inherently involving special risk and walking across the street. Is there any requirement that you should answer your radio call within so many calls? I don't know the answer. That wasn't brought up? That was not brought up. Did he check out when he got out of the car say I'm away from the car? No evidence of that either way. So none of that came up? That's correct. Do we know the nature of the call? We do not. There was no testimony as to what the nature of the call was. So again on the issue of the act of duty I would ask the court to review the language in the statute and apply it to a situation where he's reaching into the car to grab a radio. I don't think that's any different than me reaching into my car to get my cell phone or to turn down my radio or to retrieve something from the car seat. I don't think there's any there shouldn't be any risky or any special risk involved there. The fact that he was just in uniform and on duty I don't think raises it to that level of special risk that the legislator has decided to insert into the statute. What if he was reaching in to get the shotgun? Yeah reaching in to get a shotgun I don't think there's anything inherently risky to reaching in to get a shotgun. But what about the urgency of that? I mean on all the police shows they're you know getting the call there's down the street somebody's getting murdered and they're rushing in and grabbing the microphone to get the dispatch. I mean it seems to me that it would revolve more around the urgency of attending to that. I don't disagree with you and the statute doesn't address you know the actual definition as other than what is described here. But again reaching into a car I don't think it involves any special risk. You know unless it's floating in the water or something to that extent I just don't see it in this particular fact. I think some facts and circumstances type math and in this case I think the pension board properly decided that it was not an act to do. See that my time is up. Yes you'll have the opportunity for rebuttal Mr. Hendricks. Thank you. Mr. Hendricks. I want to start right out with this act of duty. The crux of the issue is according to Johnson versus the Retirement Board of Policemen's Annuity and Benefit Fund the crux is the capacity in which the officer is active. Mr. Vaughn was on duty. The evidence I believe in the record was that he was talking to a citizen at the University Mall in Carbondale he got he heard his radio and he responded to the radio and when reaching in to hit the radio he hit the top of his head on the on the doorframe of his squad car. I believe that's what the testimony is. He's clearly clearly responding to a call. I don't think that there's any question about him being on duty. The question is whether or not this being on duty covers the intent of I think it does your honor because I think that if you look again at Johnson uh the the Supreme Court rule that the fact that the officer was responding to a call for the assistance of the citizen was the crux of why his fall in the street in a puddle of water was an act of duty. It's the same thing here. Mr. Vaughn was responding to the radio dispatch call uh from his from his central dispatch and in doing so he injured himself and I believe that that rises to an act of duty and would would warrant a duty disability pension. The next thing that I would like to to tell the court is the only sworn testimony in the entire hearing for in front of the police board was that of Jeffrey Vaughn. No one else was sworn, no one else testified, everything else was told directly. The board read the medical reports, they read Lieutenant Echols reports and they made a decision. Now I also want to point out to the court that the only the only person who said that Mr. Vaughn did not hit the top of his Every doctor that that uh Mr. Vaughn went to, every doctor who took Mr. Vaughn's history, it was reported that he hit the top of the back of his head and that he injured his back or has injured his neck. There is um there is physical evidence, objective physical evidence of compression fractures in his neck. Weren't there before, never had any problems before until after this accident. Now the the doctors as far as talking about Mr. Vaughn's ability to continue work, the only doctor was one of the board's doctors and that was Dr. Cantrell who said that he could go back to work with go back with a work hardening program. However Dr. Tate who was also the board's doctor did two work hardening tests on Mr. Vaughn. Neither of them qualified him to get to the level where he could perform unrestricted duties as a police officer and it's unrebutted uncontested that the Carbondale Police Department has no light duty position at all for any swabs. So we're going to be able to determine that from the record clearly that he could not return unrestricted. I believe that's correct. I believe that if you read Dr. Supar, Dr. Tate, Dr. Blaise, Dr. Gosio, all of them, all of their reports basically say that he cannot return unrestricted. Because I saw that in the briefs and I have not seen the records yet. I found I found nothing in any of the medical records in my review of it and I don't believe the board ever made a finding that there was other than what Dr. Cantrell said which is what the board finds their hat on. They basically I think if you look at the standard of review, the standard of review I agree I would agree with Scott that the standard of review is for the court to look at clearly alone. But it also but it also says that even though there is some evidence to support the board's decision, if it's a mistake, it's a mistake. And in this particular case, it's a mistake. What the board does is they choose one out of six or seven doctors and hang all of their everything they have to say on that particular doctor. I think I think Judge Grace in his in the order that he wrote, I think he was very clear in that order about what those records were. And I and I believe that again if the board is clearly and they don't consider all of the evidence, they pick and choose what they want, particularly from a cold record with no testimony, I think their their decision was just simply wrong. There's just really in my opinion there's really not a lot for me to say because I think the record is awfully clear. I think the briefs are awfully clear about what has happened here. I think really this court needs to decide whether or not there was a mistake made by the board in reaching their decision and looking. And I think although you can't, you can't use your determination, it's a cold record. I mean, it's not. It's not like the board tested anyone's credibility. None of the report that Lieutenant Paul Eccles wrote never seen by Jeff Vaughn, never signed by Jeff Vaughn. As a matter of fact, I think his question when Mr. Hendricks asked him about that, about why there's a difference in Paul Eccles' report and all the doctors, he says you want me to tell you why Paul Eccles wrote that? How can I tell you why he wrote it? I don't know why he wrote it. He wrote it because he wrote it. But he contested that from the beginning and again every medical record from the beginning to the end pretty much says hit the top of his head or he hit the back of his head. There was also some issue about the words hurried and ran. Mr. Vaughn in one statement said I was hurrying to the car to get my radio. One of the other ones said he ran to the car to get his radio. I find that a little bit of semantics personally. I don't know what the difference between hurried and run is. I think I addressed that in my brief. So if you have no questions for me, I really don't have anything to tell you. Thank you very much. Mr. Hendricks, you have the opportunity to rebut. Briefly, counsel for the athlete stated that Judge Grace and his decision, you know, recited the base of his decision reversing the pension court decision. But he didn't apply the right standard. If you'll read Judge Grace's decision, actually I believe the decision was tainted because he interposed in this case sua sponte, an issue of whether there was a conflict or some bias by Lieutenant Ethels because he was a member of the police pension board. And he recites that and specifically stated as part of his opinion that he recognized the deferential standard but is not controlling where the board is prejudiced or biased. That was not an issue that was ever raised by any party in this case. The judge just raised it sua sponte based on his review and his opinion that Lieutenant Ethels had testified in front of him hundreds of times. So he's using information I guess outside the record in making his decision. He's also applying a different standard because he believed there was some prejudice or bias in his case. Does he say that there is or does he say there's potential? I believe if you read the opinion, he believes there is because he states that the deferential standard is not controlling when there is a proper standard review because he believed that there was prejudice or bias in his case because Lieutenant Ethels was the fellow that took the report in June of 2005. That was never raised by Mr. Vaughn. It was never raised by anyone. And if the court would review the Danko decision that's cited in my brief as well as Ethel Lee's brief, a 1992 first district case, you know, which talks about what is the standard to determine whether there's bias or prejudice, it's much more extreme than the fact that Bush was involved. In fact, the other police officers that sat on the board obviously worked with Mr. Vaughn as a police officer. So I guess theoretically all of them would be, anything that they said and believed would be biased or prejudicial as well. The fact that, so in Danko, in that case, the board member that sat on that not only had what the applicant in that case, but also called him a liar when he was testifying during the hearing, and I believe almost got into fisticuffs. And, you know, and the counsel for the applicant on several occasions moved that that member of the board be removed from the decision-making process. We don't have any of those facts here. That was just something I believe that the certain court derived for purposes of changing the standard of review. And I don't believe that was proper in this case because there's no evidence of bias or prejudice of these fellows, or of Lieutenant Echols. The police counsel also said that the board pick and choose what they looked at in the records. I think if you read their report, they stated that they reviewed in detail all of the records, that stack of medical records in detail. I think they just recited some of the things that they saw and they relied on, but as the court knows, you know, they're not going to recite each and I believe the principal ones that they relied on was Dr. Cantrell's examination of Mr. Vaughn, the FCE, the functional capacity evaluation that he had done, had performed on Mr. Vaughn, and the MRI comparison before and after by Dr. Cantrell. His report is very, the most thorough. You know, I'm also an accountant, you know, and when you do finance, you know, a lot of times banks have to be audited by, you know, by auditors. You can have two types of financial statements. You can have financial statements that aren't audited or financial statements that are audited, and certainly you're going to want to rely on something that's much more detailed and much more, you know, in-depth as far as the investigation is concerned, and I believe that's why the board looked at Dr. Cantrell's records with a little more importance because he did those things and did compare the MRIs to one another. They also looked at the other physician's report because they state that in their opinion and relied on some of the other reports that existed from the police or the workers' comp case that was pending, and those doctors that said with work hardening he could return to work. The fact the city of Carbondale said, come back to work or you'll be fired was a factor they considered. The fact that he didn't conduct any work hardening, I believe, was a factor that they determined to determine that he was not disabled. So it's not just picking and choosing. I think they just recited some of the things that they saw in the records as part of the decision. You know, in that deliberation process, I'm sure there was a lot of other things that they looked at, and for those reasons, I believe the decision was correct. We're asking this court to reverse the circuit court's decision and affirm the decision of the pension board in Mr. Bond's application. Thank you very much.